**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**PORTLAND DIVISION**

**LARRY DEAN CROW,**

Plaintiff,

v.

**BROOKS MOTOR COMPANY, INC., an Oregon corporation; and GARY BROOKS, individually,**

Defendants.

Case No. 3:13-cv-00757 -ST

**FINDINGS AND RECOMMENDATION**

**STEWART, Magistrate Judge:**

## INTRODUCTION

Plaintiff, Larry Dean Crow ("Crow"), filed this action on May 3, 2013, arising from auto body work that he performed in 2012 at Brooks Motor Company, Inc. ("Brooks Motor Co."), which acquires cars for resale to the general public. He alleges claims against Brooks Motor Co. and its President and Secretary, Gary Brooks ("Brooks"), as joint employers for:

(1) violation of the minimum wage provisions of the Fair Labor Standards Act ("FLSA"), 29 USC § 206(a)(1) (First Claim);

(2) violation of Oregon's minimum wage provision, ORS 653.025 (Second Claim);

(3) violation of the overtime provisions of the FLSA, 29 USC § 207(a)(1) (Third Claim);

(4) violation of Oregon's overtime provisions, ORS 653.261 and OAR 839-020-0030 (Fourth Claim);

(5) failure to pay unpaid wages when due upon termination of employment in violation of ORS 652.140 and OAR 839-001-0420 (Fifth Claim); and

(6) breach of contract resulting from failing to pay Crow the promised wages at the rate agreed upon at the time of hire (Sixth Claim).

This court has jurisdiction over Crow's FLSA claims under 28 USC § 1331 and 29 USC § 216(b) and over Crow's supplemental state law claims under 28 USC § 1367(a).

Defendants have filed a Motion for Summary Judgment (docket #24) on the basis that Crow was an independent contractor and not an employee. Due to disputed issues of material facts, that motion should be denied.

## SUMMARY JUDGMENT STANDARD

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any material fact and "the moving party is entitled to judgment as a matter of law." The moving party must show the absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986). Once the moving party does so, the nonmoving party must "go beyond the pleadings" and designate specific facts showing a "genuine issue for trial." *Id* at 324, citing FRCP 56(e). The court must "not weigh the evidence or determine the truth of the matter, but only determine[] whether there is a genuine issue for trial." *Balint v. Carson City*, 180 F3d 1047, 1054 (9th Cir 1999) (citation omitted). A "'*scintilla* of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert denied*, 493 US 809 (1989) (emphasis in original) (citation omitted). The substantive law governing a

2 – FINDINGS AND RECOMMENDATION

claim or defense determines whether a fact is material. *Addisu v. Fred Meyer, Inc.*, 198 F3d 1130, 1134 (9th Cir 2000) (citation omitted). The court must view the inferences drawn from the facts "in the light most favorable to the nonmoving party." *Farrakhan v. Gregoire*, 590 F3d 989, 1014 (9th Cir 2010), citing *Anderson v. Liberty Lobby, Inc.*, 477 US 242, 255 (1986).

## UNDISPUTED FACTS

The facts viewed in the light most favorable to Crow are as follows:

### I. Brooks Motor Co. Facilities

Brooks opened Brooks Motor Co. in 2001. Brooks Depo.,[1] p. 15. At that time Brooks Motor Co. only sold used cars on a sales lot on McLoughlin Boulevard. *Id*. Any mechanical work required to prepare the car for sale was obtained through independent mechanic shops. *Id*, p. 18. In July 2004, Brooks Motor Co. purchased a mechanic shop in Beavercreek, Oregon, where it opened its service department in 2005 in order to guarantee "cheaper and more accurate" work. *Id*; Nazari Decl. (docket #43), Ex. J. To retain control over the cost and operation of mechanic work done on the cars that would be sold on its lot, Brooks Motor Co. hired a mechanic and purchased three lifts. Brooks Depo., pp. 21-22.

In December 2011, Brooks Motor Co. purchased the property and structure across the street from the mechanic shop. Nazari Decl., Ex. K. It improved the building by painting it and putting up a sign. *Id*, Exs. D-F.

Prior to May 2012, Brooks Motor Co. called several different people to bid on auto body work to be done offsite on their own premises. Brooks Depo., pp. 41-42, 44. If the cost seemed too high, Brooks Motor Co. contacted another body shop. *Id.* Other companies, referred to as

---

[1] Excerpts of the transcript of the Deposition of Gary Brooks are attached to the Nazari Decl. (docket #43), Ex. L, and Nazari Supp. Decl. (docket #59), Ex. P.

3 – FINDINGS AND RECOMMENDATION

dent doctors, painted bumpers and did light bodywork and air brushing on the Brooks Motor Co. premises because it was cheaper than doing the work offsite. *Id*, pp. 41-42.

## II. **Crow's Hire**

Crow has done auto body work and painting for over 20 years. Crow Decl. (docket #44), ¶ 1. In 2011, he approached Brooks about working at Brooks Motor Co. *Id*, ¶ 3.

In April 2012, Crow approached Brooks again about a job. *Id*, ¶ 5. For months prior to that time, Crow rented a barn on his property where he did auto body and painting work under the name of Car Arts Co. Vosika Decl. (docket #46), ¶ 4 & Ex. A; Brandt Decl. (docket #26), Exs. 5-7. However, he could not accept any work from Brooks Motor Co. because his shop was not suitable to meet its auto body or paint needs.[2] Crow Decl., ¶ 3.

On or about April 10, 2012, Crow was hired by Brooks Motor Co. in the mechanic shop to do lube work and safety checks. *Id*, ¶ 5. He recorded his hours on a sheet of paper that he gave to Brooks and was paid $10 an hour. *Id*.

Crow used his step-father's truck to bring all of his tools into the mechanic shop. *Id*, ¶ 6. Vosika Decl. ¶ 8. Because his tool box weighs several hundred pounds, he removed it from the bed of the truck using a hydraulic lift and rolled it into the mechanic shop for storage and use. Crow Decl., ¶ 6. Other mechanics in the shop also had their own tool boxes in the shop. *Id*. He worked in the mechanic shop for about a month and received training in how to use an automobile lift. *Id*, ¶ 7.

---

[2] The parties dispute why Crow's shop was not suitable for Brooks Motor Co. Brooks states that he intended to send work to Crow's shop until he discovered that he did not have a driver's license to drive cars back and forth. Brooks Depo., pp. 47, 68, 101. That testimony is supported by a document signed by Crow authorizing a driver's license report and also containing a handwritten note: "need drivers license." Brandt Decl., Ex. 2. However, Crow states that he "believed that [he] had a valid drivers license" and had "paid for auto insurance." Crow Decl., ¶ 4. For purposes of this motion, the court accepts Crow's testimony.

On or about April 30, 2012, Brooks asked Crow if he wanted to start doing auto body work across the street in Brooks Motor Co.'s body shop along with Roman Luciano.[3] *Id*, ¶ 8. He wanted Crow to give him estimates on how much time it would take him to complete a repair project and agreed to pay him $15 per hour. *Id*. He accepted because he wanted to help make Brooks Motor Co. succeed and keep on working there. *Id*.

When he started work in Brooks Motor Co.'s body shop on May 7, 2012,[4] a few of the other employees helped him push his tool box out of the mechanic shop across the street into the body shop. *Id*, ¶ 10. Brooks trained him on how to open and close the body shop, placed him in charge of opening and closing the doors, and instructed him on how to set the security alarm and how to use the circuit breaker. *Id*, ¶ 11. In the beginning, Crow was given keys to the body shop and could open as early and close as late as he wanted and also work on weekends. *Id*, ¶ 18; Brooks Depo., p. 106. Roman Luciano left the body shop a few weeks later. Crow Decl., ¶ 8.

While working in the body shop, Crow repaired cars for Brooks Motor Co. to sell in its lot and also for its customers. *Id*, ¶ 9. He worked on five to ten cars per week, 90% of which were Brooks Motor Co.'s cars. *Id*. Brooks brought in various cars to ask him how long it would take to fix, and he was called across the street to the mechanic shop or lot to give estimates on repairs. *Id*, ¶ 12. Using his judgment based on 20 years of experience, he gave a bid based on how many hours he estimated the job would take to complete. *Id.* Brooks told Crow that if the

---

[3] According to Brooks, Roman Luciano owns his own body shop and was called by Brooks Motor Co. for "sporadic" work. Brooks Depo., pp. 44, 46. He worked onsite at Brooks Motor Co. "maybe a small amount" in 2012. *Id*, p. 44. Brooks Motor Co. asked him to leave in May 2012 because it did not have any work for him. *Id*, pp. 45-46. Brooks then offered auto body work to Crow because his mother appealed to him to help out her unemployed son. *Id*, pp. 46-47.

[4] Although Crow does not specify the date, Brooks Motor Co. has a record showing his "Date of Hire" as "5-7-2012." Brandt Decl., Ex. 2, p. 1.

5 – FINDINGS AND RECOMMENDATION

bid did not match what he thought it should cost, he would give the job to someone else.[5] *Id*. Crow agreed to Brooks' price because he "had no choice." *Id*. His tools were at Brooks Motor Co. and he could not work anywhere else without them. *Id*, ¶¶ 12, 17.

As with Crow, Brooks Motor Co. pays its mechanics an hourly rate based on an estimate generated by a computer program of the number of hours needed to do the job. Brooks Depo., pp. 26, 51 ("it's the exact same thing"). A mechanic who completes the work faster than the estimate generated by the computer is paid the full amount of the estimate. *Id*, p. 26 However, if it takes the mechanic more than the estimated time, he only will receive the estimated hours times the hourly rate. *Id*, pp. 27-28. Crow asked Brooks for a similar computer program for use in the auto body shop, to which Brooks never responded. Crow Decl., ¶ 14.

Although he used his own tools, as is customary in the auto body industry, he could not perform the auto body and paint work without a shop equipped with a paint booth, compressor, electricity, water, and safety supplies that Brooks Motor Co. provided. *Id*, ¶ 16. Although Crow ordered the supplies necessary to complete the work on cars brought into the body shop, Brooks Motor Co. paid for them. *Id*, ¶ 15.

On or about July 17, 2012, Brooks took the keys away from Crow. *Id*, ¶ 18. As a result, Crow was limited to working Monday to Friday between 8:00 am and 5:00 pm. *Id*. Brooks made it clear to him that he was not to work in the shop beyond business hours. *Id*.

How many hours Crow worked is unknown because neither he nor Brooks Motor Co. has any record of them. Crow handwrote his bid and submitted an invoice when he finished a job. Brooks Depo., pp. 68-69. Those records were kept at the body shop, but can no longer be located. *Id*, pp. 68, 70. The only documents in the record are some receipts signed by Crow

---

[5] According to Brooks, this is the same procedure used with every other subcontractor and $15 an hour is the standard rate for auto body work. Brooks Depo., p. 49. Subcontractors were paid the amount of the bid whether the job took greater or fewer hours. *Id*, p. 51.

(Brandt Decl., Ex. 2; Crow Decl., ¶ 13), the checks issued to Crow by Brooks Motor Co. dated May 15 to October 5, 2012, for each completed job (totaling $8,471.50), and a Form 1099 issued by Brooks Motor Co. Brooks Decl., Exs. 3-4; Brooks Depo., pp. 69, 71.

Before and while working at Brooks Motor Co., Crow posted ads on Craigslist because he wanted auto body work. *Id*, ¶ 20. He never got any work from the ads. *Id*. While working at Brooks Motor Co., he changed his ad to read in part: "I currently work for a small dealer repairing cars for him and I have my own little shop where I do my own work for myself." *Id*; Brandt Decl., Ex. 8, pp. 10-11. Although Brooks had told him that he could not do any work for his own customers at Brooks Motor Co., he wanted to draw potential customers to Brooks Motor Co. Crow Decl., ¶ 20.

Before and while working at Brooks Motor Co., Crow also worked part-time for J&S RV Service, Inc. for which he received Forms 1099-Misc. Brandt Decl., Ex. 4. What work he did, how much and where are not disclosed by the record.

### III. Crow's Termination

In early August 2012, the Fire Department shut down Brooks Motor Co.'s body shop for weeks. Crow Decl., ¶ 22; Nazari Decl., Ex. I; Brooks Depo., p. 48. Crow was prevented from working when the body shop was closed and had no access to his tools. Crow Decl., ¶ 22. Because he could no longer work there, he resigned. *Id*.

After Crow left, Brooks Motors Co. installed a new paint booth and hired Eddy Blattner as a permanent employee to perform its auto body work. Brooks Depo., p. 43. As did Crow, Blattner does body work on cars to be sold by Brooks Motor Co. and on its customers' cars by giving an estimate based on how long the job will take. Nazari Decl., Ex. M ("Blattner Depo."), p. 25. Brooks Motor Co. pays for the materials and pays Blattner $15 per hour "on shop hours."

*Id*, pp. 25, 17; Brooks Depo., p. 86. Although somewhat unclear from the record, it appears that he is paid for 40 hours a week,[6] rather than an agreed number of hours for each job. Brooks Motor Co. does not keep track of the actual hours worked by any of its employees, but does not allow them to work any overtime hours. Brooks Depo., pp. 77, 86-87. However, unlike Crow, he works Monday through Friday, 8:00 am to 5:00 pm, and is generally busy all day, even if cleaning the shop or putting away tools. Blattner Depo., pp. 18-20, 25. He keeps some, but not all, of his tools at Brooks Motor Co. *Id*, pp. 14-15.

## FINDINGS

### I. Legal Standard

Assuming the underlying facts are not disputed, "[w]hether an employer-employee relationship existed under the FLSA is a question of law." *Hale v. State of Ariz.*, 967 F2d 1356, 1360 (9th Cir 1992) (citation omitted). "The terms 'independent contractor,' 'employee,' and 'employer' are not to be construed in their common law senses when used in federal social welfare legislation. Rather, their meaning is to be determined in light of the purposes of the legislation in which they were used." *Usery v. Pilgrim Equip. Co., Inc.*, 527 F2d 1308, 1311 n6 (5th Cir 1976) (citations omitted).

Under the FLSA, the term "employ" "includes to suffer or permit to work." 29 USC § 203(g). "The FLSA's definition of employee has been called the "broadest definition that has ever been included in any one act." *Torres-Lopez v. May*, 111 F3d 633, 638 (9th Cir 1997), quoting *United States v. Rosenwasser*, 323 US 360, 363 n3 (1945).

Courts consider various factors in determining whether a person is an "employee" for purposes of social legislation such as the FLSA. *Donovan v. Sureway Cleaners*, 656 F2d 1368,

---

[6] Brooks also testified that Blattner is currently paid a salary. Brooks Depo., p. 99.

1370 (9th Cir 1981). The Ninth Circuit has distilled from Supreme Court cases a non-exhaustive list of such factors, including:

> 1) the degree of the alleged employer's right to control the manner in which the work is to be performed;
> 2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;
> 3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers;
> 4) whether the service rendered requires a special skill;
> 5) the degree of permanence of the working relationship; and
> 6) whether the service rendered is an integral part of the alleged employer's business.

*Real v. Driscoll Strawberry Assocs., Inc.*, 603 F2d 748, 754 (9th Cir 1979) (citations and footnotes omitted).[7]

In considering these factors, the court is guided by the "economic realities" and the "circumstances of the whole activity." *Rutherford Food Corp. v. McComb*, 331 US 722, 729-730 (1947). Neither contractual labels nor the parties' subjective intent can override the economic realities reflected in the various factors. *Real*, 603 F2d at 755 (citations omitted).

## II. Analysis of Factors

### A. Right to control the manner in which the work is performed

Although defendants were concerned about the end result, namely the repair of cars for resale, they did not care, and exercised no control over, the manner in which Crow performed his work. They provided Crow with an appropriate space and infrastructure, including a compressor and paint booth. Crow points out that those facilities were only available during normal business hours after July 17, 2012, when he no longer had a key to the shop. Additionally, the record

---

[7] Although Crow refers to five regulatory and eight non-regulatory factors gleaned from *Torres-Lopez*, 111 F3d at 639-40, those factors were listed by the Ninth Circuit to determine whether a joint employment relationship existed. For purposes of this motion, defendants do not contest that they are joint employers.

indicates that defendants kept a steady stream of cars flowing into and out of the mechanic and body shops that kept Crow working on five to ten cars per week.

Nonetheless, nothing in the record supports the conclusion that defendants supervised the manner in which Crow performed auto body work. Instead, each car was presented to Crow for an estimate of how long it would take to complete the necessary work. Crow then performed the work based on an agreed upon number of hours for $15 per hour. There is similarly no evidence that defendants prevented Crow from working elsewhere. This is supported by Crow's ads on Craigslist soliciting auto body work and his part-time work at J&S RV. Thus, this factor supports defendants' contention that Crow was not an employee.

### B. **Opportunity for profit or loss depending upon managerial skill**

Defendants contend that Crow had an "opportunity for profit or loss" because he bid his jobs by estimating the number of hours that the particular job would require. If he completed the job sooner, then he earned more than $15 per hour. If the job took longer, then he earned less than $15 per hour. The economic result was up to Crow based on his 20 years of experience of doing the work and bidding jobs.

Crow responds that his jobs were akin to "piece work" and that he had no opportunity for profit or loss because defendants fixed his hourly rate and then dictated the estimate of hours they would accept. In particular, Crow asserts that defendants were fully aware of his precarious financial situation and the fact that his tools were all located in their auto body shop and not easily transportable. In addition, he was not permitted to work in their auto body shop on any vehicle not belonging to Brooks Motor Co. Armed with this knowledge, defendants had Crow between a rock and a hard place and used the information to their advantage.

The fact remains, however, that, based solely on his experience and skill, Crow estimated the number of hours he needed to do a job and submitted a bid which defendants were either free to accept or reject. That method of operation was no different from his usual and customary way of doing business before moving to the premises of Brooks Motor Co. If his bid was not accepted, he was free to leave Brooks Motor Co. at any time and bid on other jobs. That he was in need of work and preferred to stay at Brooks Motor Co. is not sufficient to eliminate his opportunity for profit or loss depending on the amount of his bid. Thus, this factor also supports defendants' contention.

C. **Employee's investment in equipment or materials**

As is usual and customary in the trade, Crow had and used his own tools. However, those tools were of limited worth without an appropriate space and other equipment, such as a compressor and paint booth, that Brooks Motor Co. provided. In that respect, Crow's "investment in light equipment . . . is minimal in comparison with the total investment in land, heavy machinery and supplies necessary" to perform the work. *Real*, 603 F2d at 755.

Crow highlights the fact that Brooks Motor Co. paid for the materials and supplies needed to do his work. However, when working with vendors, Brooks Motor Co. normally would be expected to pay a price that covers both labor and materials. Nothing in the record indicates that by paying for Crow's materials, Brooks Motor Co. was treating Crow any differently than any other vendor.

Moreover, Crow had his own shop where he had done the same type of work prior to Brooks Motor Co. Therefore, he had made the same investment as Brooks Motor Co., but opted not to use that investment. As previously noted, the facts are disputed as to why he moved his operation to Brooks Motor Co. If he did so solely for his own convenience due to the lack of a

driver's license, then this factor cuts against his status as an employee. If not, then this factor favors Crow's status as an employee.

It also must be noted that while at Brooks Motor Co., he also worked part-time for J&S RV even without his tools and equipment which seemingly favors defendants' contention. However, the record does not reveal what work he did for J&S RV or what tools he used or who owned those tools. Without those additional facts, the weight of this factor is unclear.

### D. Whether the service rendered requires a special skill

The auto body work performed by Crow clearly requires a special skill and is normally done on a piece work or flat rate basis. It involves more than just the "physical labor" at issue in *Real* (planting strawberries). Thus, this factor favors defendants' contention.

### E. Degree of permanence of the working relationship

Although his relationship with defendants lasted no more than about seven months, Crow contends that it would have continued longer had the fire department not shut down the body shop. However, Crow testified only that he "wanted to keep working at Brooks Motor Co." and left because he "could no longer work there" after the body shop closed down for a period of time. Crow Decl., ¶ 8, 22. The record is silent as to how long Brooks Motor Co. intended to send its auto body work to Crow before, during, or after his seven months working in its shop. Thus, the weight of this factor is unclear.

### F. Whether the service rendered is an integral part of the business

Crow contends that the auto body work was an integral part of Brooks Motor Co.'s business, while defendants contend it was only "incidental" to their main line of work reselling cars. Crow paints a colorable story that Brooks Motor Co. was actively expanding its business

and incorporating auto body work into its overall business plan. Viewing the facts in Crow's favor, this factor cuts against defendants' contention.

However, the record also reveals only that Crow was working part-time for Brooks Motor Co. and that a full-time auto body technician was not hired until after Crow left and the auto body shop was remodeled. Thus, the weight of this factor is unclear.

**G. Conclusion**

Had Crow performed auto body work for Brooks Motor Co. at his own shop, this court would easily conclude that he was not an employee of Brooks Motor Co. for purposes of the FLSA. He did the same auto body work on the premises of Brooks Motor Co. as he could have done at his own shop. The only difference is that once he started working at Brooks Motor Co., he took all his tools onto its premises which he could not easily move and to which he had no access outside normal business hours once he no longer had keys to the shop. The question is whether this lack of access to his tools converts him from an independent contractor to an employee.

This court is not inclined to draw a bright line based on that one difference, given the factual dispute between the parties as to why Crow opted to work on the premises of Brooks Motor Co., rather than at his own shop. Moreover, at this juncture all reasonable inferences from the evidence must be drawn in Crow's favor. As noted above, Crow has presented facts to support his assertion that Brooks Motor Co. was actively expanding its business to incorporate auto body work and that his relationship with defendants was interrupted only due to the fire department shutting down the body shop. Viewed in Crow's favor, the evidence supports the inference that the economic reality of his relationship with defendants differed significantly from a purely arms-length negotiation that one would expect to see between independently contracting

parties. In addition, the records supplied by defendants indicate that Brooks worked at their body shop more than 20 hours per week between May and July 2012. Brooks Decl., Ex. 3.

At this point, disputed facts foreclose summary judgment in favor of defendants that Crow was not their employee.

## RECOMMENDATION

For these reasons, defendants' Motion for Summary Judgment (docket #24) should be DENIED.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due Monday, December 01, 2014. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED November 10, 2014.

s/ Janice M. Stewart

Janice M. Stewart
United States Magistrate Judge